UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| IGOR MALENKO, individually and <br> On behalf of his minor child, M.M., <br><br> Plaintiff, <br><br> v. <br><br> LORI HANDRAHAN, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) Docket no. 2:11-cv-250-GZS <br> ) <br> ) <br> ) <br> ) <br> ) |

### ORDER ON MOTION FOR DEFAULT JUDGMENT

Before the Court is Plaintiff's Second Motion for Default Judgment (ECF No. 56). The Court entered default as to Defendant Lori Handrahan on June 28, 2012 (ECF No. 53). On August 31, 2012, the Court held an evidentiary hearing at which it received evidence on Plaintiff's claims and damages.

Plaintiff Igor Malenko, individually and on behalf of his minor child, M.M., appeared with counsel, Michael J. Waxman, Esq. Evidence at the hearing consisted of the following: (1) testimony from Mr. Malenko, and (2) exhibits numbered 1-27 (ECF No. 65). In addition, Plaintiff's counsel requested the Court to take judicial notice of the Order dated May 3, 2012, from State of Maine District Court Judge Jeff Moskowitz in the family matter case, FM-08-510 (Pl. Ex. 7). Following the hearing, Plaintiff submitted proposed findings of fact and conclusions of law (ECF No. 68) on September 4, 2012.

Having reviewed the entire record, the Court now finds that the preponderance of the undisputed evidence and the law supports a judgment in favor of Plaintiff on Counts I, IV, and VIII and a total compensatory damage award totaling $750,000.00 ($450,000 on Plaintiff's individual claims and $300,000 on the claims brought on behalf of Plaintiff's minor child).

I.   **FINDINGS OF FACT**[1]

1.  Plaintiff Igor Malenko ("Malenko") is an individual who resides in the city of South Portland, County of Cumberland, State of Maine.  Malenko is the father, and court-determined custodial parent of one minor child ("M.M."), whose date of birth is xx/yy/2006.

2.  Defendant Lori Handrahan ("Handrahan") is an individual who resides in Washington, D.C., County of Washington, District of Columbia.

3.  Malenko and Handrahan were married on May 30, 2006 in Bar Harbor, Maine.

4.  A child, M.M., was born to Malenko and Handrahan on xx/yy/2006.

5.  On May 16, 2008, Malenko filed a Divorce Complaint against Handrahan.

6.  On May 23, 2008, Malenko served the Divorce Complaint against Handrahan.

7.  Immediately after being served with the Divorce Complaint, Handrahan filed a Protection from Abuse Complaint ("PFA") against Malenko on May 23, 2008, making false claims that Malenko suffered from mental illness.

8.  As a direct result of this retaliatory and false PFA Complaint, Malenko's fundamental and constitutionally-protected interests in the nurture, upbringing, companionship, care, and custody of his child were substantially infringed upon.

9.  After the guardian *ad litem* appointed by the Court and the Court-appointed doctorate level forensic psychologist indicated that they did not believe Malenko was suffering from mental illness or any other defect that would prohibit him from having unsupervised contact with his child, Handrahan then began making false claims that he was a homicidal abuser, as part of her effort to destroy the father/daughter bond.

---

[1] As Plaintiff correctly points out, the factual allegations of the June 27, 2011 Complaint (ECF No. 1) are deemed admitted due to Defendant's default. See Libertad v. Sanchez, 215 F.3d 206, 208 (1st Cir. 2000).  "However, liability and the amount of damages are not necessarily established as a result of the default."  Katahdin Paper Co., LLC v. U &

10. The court hearing the divorce case ultimately rejected Handrahan's claims of abuse and mental illness and granted Malenko significant rights of unsupervised visitation with his child.

11. Handrahan repeatedly violated provisions of the Divorce Judgment, made unilateral decisions regarding the child's welfare, and continued to do everything in her power to damage or destroy the father/daughter bond.

12. Finally, Malenko filed several Motions to Modify, asking the Court to grant him custody of the child.

13. Days after the Court sent out Notices of Hearing on the several Motions to Modify, Defendant forced her child to repeat false statements about Malenko sexually abusing her.

14. Defendant even forced her two year old child to make these false, rehearsed statements while Defendant recorded them on a video recorder.

15. Defendant persuaded her friend and advocate to listen to the false, coached statements, and then to contact the Department of Health and Human Services ("DHHS") and claim that the child had made a disclosure of sexual abuse.

16. Defendant also persuaded her friend and advocate to make completely unsubstantiated claims that Malenko had child pornography on his computers.

17. As a result of these claims, DHHS launched an investigation.

18. As a result of these claims, Malenko's rights to as a parent of M.M. were substantially infringed upon.

19. Defendant continued to coach and force her then two year old child to make false statements to others including Spurwink Child Abuse Program ("Spurwink") investigators regarding Malenko.

20. As a result of similar false claims by Handrahan's friend, and as a result of more false claims that Handrahan made to Spurwink, the minor child was subjected to an invasive medical exam by Spurwink's medical team as it looked for evidence of sexual trauma, which Handrahan knew did not exist.

21. Thus, as a direct result of the claims caused to be made by Handrahan and with Handrahan's consent, her two year old child was examined by various medical professionals.

22. As a direct result of the false claims by Handrahan and her friend and advocate, the two (2) year old child underwent at least 8 separate interviews regarding alleged sexual abuse by her father.

23. The examination of the child's genitals and the numerous interviews regarding false allegations of sexual abuse caused direct harm to the child.

24. The Portland office of DHHS unsubstantiated the claims on August 20, 2009.

25. Handrahan immediately demanded that DHHS at the highest levels reconsider this determination of "unsubstantiation."

26. Dan Despard, the Director, Division of Child Welfare, then conducted a *de novo* review of the file and affirmed the decision made regarding unsubstantiation, by letter dated August 25, 2009.

27. On or about August 14, 2009, understanding that her and her friend's false claims were about to be discredited by DHHS, Handrahan unilaterally took the child four hours north of her home in South Portland, to her vacation home in Sorrento, Maine.

28. On August 14, 2009, Handrahan then filed yet another PFA, this time in Ellsworth District Court, making more false claims that Malenko had sexually abused their child, and also making false allegations that "he was discharged from the [Yugoslavian] Army for pointing a gun at an officer's head."

4

29. Handrahan filed this PFA in Ellsworth District Court specifically to avoid Judge Jeff Moskowitz, the Portland District Court Judge who had presided over the divorce trial.

30. Handrahan wrote an article, published on June 2, 2009 in the Bangor Daily News, entitled "American courts have never been kind to women, kids," in which she was critical of Judge Moskowitz's decisions in the divorce trial.

31. As a direct result of this false PFA in the Ellsworth District Court, Handrahan stripped Malenko of his parental rights and ability to see M.M. for a period of time.

32. The PFA case was transferred back to Portland District Court, where Handrahan was provided a full opportunity for a hearing before Judge Jeff Moskowitz, on October 26, 2009.

33. Handrahan decided not to appear at this final hearing on her PFA, because, as she later testified under oath, it was "inconvenient."

34. On October 26, 2009, after a full hearing, Judge Moskowitz dismissed the PFA from the bench, finding that Handrahan had presented "extremely precarious evidence of an extremely serious charge."

35. On November 2, 2009, the parties entered into a Stipulated Order giving Malenko unsupervised visits with his child every single weekend, from Thursday through Sunday one week and Friday through Sunday the next week.

36. Malenko enjoyed the 2009 Thanksgiving and Thanksgiving weekend with his child for the first time in over a year.

37. Malenko and his attorney, Michael Waxman, became friends through this ordeal, and Waxman invited Malenko and his child to spend Thanksgiving with his children, his ex-wife (Carol Amoroso), her husband and friends, at Amoroso's house.

38. Malenko and his child also spent the following weekend with Waxman and his children and his parents at the family's vacation home in New Hampshire.

39. Upon hearing of the visits Malenko and his child enjoyed with Waxman, Handrahan filed a Protection from Harassment Complaint ("PFH") against Waxman in Ellsworth District Court.

40. The PFH claimed that Waxman had harassed and threatened and harmed Malenko and Handrahan's child.

41. Handrahan had no basis upon which to make these claims.

42. These were false claims made in an effort to prevent Waxman from continuing to represent Malenko.

43. Handrahan's goal was to strip Malenko of legal representation so that he would have no way to defend himself in ongoing proceedings.

44. Handrahan knew that Waxman was not charging Malenko for his legal representation.

45. Handrahan filed this PFH in Ellsworth, once again, in order to avoid Portland judges, whom she believed had been conscripted by Waxman into a conspiracy to harm her and deny her justice.

46. On February 12, 2010, Waxman had a hearing on his Motion to Dismiss the temporary PFH before Portland District Court Judge, Honorable Roland Beaudoin, who dismissed the temporary order.

47. On March 4 and March 5, Portland District Court Judge, Honorable Jane Bradley, presided over Handrahan's PFH Complaint against Waxman.

48. On April 7, 2010, Judge Bradley dismissed Handrahan's PFH case against Waxman.

49. Handrahan also began filing numerous grievances against Waxman in the fall of 2009 and continuing into 2010. These grievances were part of Handrahan's effort to prevent Waxman from continuing to represent Malenko.

50. On December 2, 2010, Justice Alexander, of the Maine Supreme Judicial Court, filed a 65 page decision exonerating Waxman of the 14 counts of unethical conduct alleged by Handrahan.

51. Handrahan also contacted DHHS Child Support Enforcement beginning in November 2009 and falsely claimed that Malenko owed in excess of $7,000 in child support.

52. These false claims caused DHHS to withhold Malenko's tax return in 2010 for months, causing a tremendous financial hardship for Malenko.

53. DHHS finally discovered Handrahan's representations were false and turned the tax return monies over to Malenko.

54. In January 2011, Malenko finally was granted a hearing on his multiple motions to modify before Portland District Court Judge Jeff Moskowitz.

55. Handrahan attended this hearing and was represented by counsel.

56. By Order dated February, 1, 2011, Judge Moskowitz stripped Handrahan of custody of the minor child and transferred custody to Malenko.

57. By that same order, Judge Moskowitz also allocated decision-making authority regarding the minor child's welfare to Malenko, if the parties could not reach agreement.

58. Judge Moskowitz also stated as follows: "the Defendant [Handrahan] has simply resisted Plaintiff's [Malenko's] efforts to be [the minor child's] father at nearly every turn."

59. Before and after this Order, Handrahan made repeated false claims to DHHS and to medical providers that Malenko was poisoning the minor child with methamphetamines and sexually abusing his daughter.

60. Just after this Order entered, Handrahan contacted DHHS and made claims that Malenko had hit the child in the head with a frying pan.

61. These claims were all false.

62. As a result of these false claims, the then four year old child had an invasive medical exam conducted at Maine Coast Memorial Hospital with Handrahan's consent.

63. Also, Handrahan herself took urine and fecal samples from her child and presented them to medical providers to be tested for drugs.

64. Handrahan also froze several samples of her daughter's urine for later testing.

65. Handrahan also forced her child to state into a recording device that Malenko had hit her in the head with a frying pan.

66. Handrahan presented this false, coached, audio tape to DHHS.

67. As a direct result, the Ellsworth office of DHHS launched another investigation into Malenko, and interviewed the child on at least two occasions regarding the frying pan.

68. The child clearly and forthrightly stated that her father never hit her in the head with a frying pan, and that she knew Handrahan was saying this happened, but it was not true.

69. DHHS issued another letter unsubstantiating these false allegations on April 29, 2011.

70. On or about the week of June 13, 2011, Handrahan made yet another false claim with DHHS, claiming that Malenko was poisoning the minor child with methamphetamines and that Malenko possessed child pornography on his computers.

71. DHHS opened a file in the Biddeford office because Handrahan claimed that Waxman had "connections" with the Portland and Ellsworth offices, each of which had unsubstantiated previous claims.

72. Mark Dalton, DHHS Regional Manager for York County, has stated that there is no evidence supporting these claims by Handrahan.  In a letter dated June 27, 2011, DHHS again found the allegations of neglect and sexual abuse against Malenko to be unsubstantiated.  See Pl. Ex. 8b.

73. Handrahan has also reached out to the administration of Governor LePage in order to try and destroy Malenko's fundamental rights as a parent. These communications included false statements about Malenko in order to persuade Governor LePage to act on her behalf.

74. As a result of Handrahan's behavior, M.M. was required to stop attending a day care center where she had become attached to friends and caregivers. M.M. has experienced social isolation as a result of Handrahan's actions and threats.

75. Even though she testified in January that she makes $105,000 per year and even though the February 1, 2011 Order obligates her to pay Malenko $368.80 per week, Handrahan has repeatedly withheld child support payments. See Pl. Ex. 26.

76. Handrahan has evaded service of process and refused to accept service of process in connection with this case and other related legal proceedings.

77. On June 21, 2011, Handrahan arrived at Malenko's residence and pounded on his front door screaming "give me my child!!!" "where is my child?" "I am here to take my child!!" "Why are you hiding my child??"

78. Handrahan proceeded to run around the house, peering into windows and screaming.

79. The child was in Malenko's arms and traumatized, not wanting to go to her mother.

80. Malenko called the police and they escorted her off Malenko's property.

81. Malenko obtained a PFH on his own behalf and on behalf of his minor child the next day, June 22, 2011.

82. On June 23, 2011, Handrahan sent her private investigator, Stephen Pickering, a former Maine State Trooper, to the home of attorney Waxman's children and his children's mother, Carol Amoroso.

83. The private investigator, Stephen Pickering, banged on the front door, walked around the property, and called Ms. Amoroso on the phone, demanding to speak with her.

84. Ms. Amoroso declined to be interviewed and was very shaken up by this conduct. As a result, she contacted the Yarmouth Police about this incident.

85. None of Waxman's four children were at Ms. Amoroso's house when Mr. Pickering approached the premises.

86. Waxman's four children have been warned that there is a private investigator hired by Handrahan, trying to intimidate Waxman's loved ones, and that if he makes contact with them, they are to refuse to cooperate and that they should contact the police.

87. By sending her private investigator to the home of Malenko's attorney's children, Handrahan intended to intimidate attorney Waxman and to deprive Malenko of further legal services.

88. Beginning in the Fall of 2011 and following Malenko's filing of this action, Handrahan initiated broad dissemination of defamatory material regarding Malenko on the internet.

89. Handrahan launched a site called "Saving M.M."[2] on which she placed a great deal of material, including many claims that Malenko has abused his child, has raped his child, has poisoned her with methamphetamines, has sold her to obtain money for a green card, has "trafficked" her, has been visiting child pornography sites on the internet, has placed M.M. in a pedophile ring, has conspired with others including his attorney, judges, district attorneys, DHHS workers and others. See Pl. Exs. 10-19.

90. Handrahan has made significant efforts to ensure that the material on her "Saving M.M." website is viewed by many others and disseminated worldwide. See, e.g., Pl. Ex. 16.

91. Handrahan has sent these same false claims to multiple people by email, including multiple government officials. See Pls. Exs. 1-5.

---

[2] In an effort to further protect the identity of the minor at the center of this case, the Court has altered the name of the website in this published order so that the minor's name is not included.

92. Handrahan has posted many audio tapes on various sites also, which contain similar false statements regarding Malenko.

93. Handrahan also posted a picture of M.M.'s genitals on her "Saving M.M." website. See Pl. Ex. 6.

94. Handrahan has also posted personal information regarding Malenko and M.M., including their addresses, Malenko's social security number and employment information.

95. Handrahan coached her child (at age 2 ½) to make false statements about Malenko sexually abusing her into a video camera and she has posted that video on the internet. See Pl. Ex. 27.

96. As a direct result of Handrahan's defamation, Malenko has received threats from followers of Handrahan. Malenko has also been warned by local police regarding threats against him that they considered serious.

97. As a direct result of Handrahan's defamation, Malenko's life has been significantly and negatively impacted in many ways.

98. Malenko, normally an outgoing, friendly person, now lives in many ways like a recluse, refusing to initiate new relationships and anxious about his present relationships because he is well aware that the staggering quantity and disgusting quality of the online defamation could convince others that he is some kind of monster.

99. Malenko carries with him at all times numerous court documents and decisions from DHHS, just in case Handrahan makes new, false claims against him.

100. Malenko testified that M.M. has been negatively impacted by the vast quantity and malicious quality of defamatory material in that Malenko has been very, very concerned about permitting other children into his home without the parents in attendance. He has

been so shaken up by the heinous defamation published by Handrahan that he feels completely on the defensive at all times around all children.

101. Malenko testified that he has been trained in and received certifications as a swimming instructor, that he formerly derived income and a great deal of enjoyment from coaching and teaching children to swim. As a direct result of the defamation all over the internet, Malenko no longer teaches any children swimming skills other than his own, and is unlikely ever to do so again.

102. Malenko testified that the defamation has negatively impacted his performance at his job, prompting him to lose concentration and make mistakes he would not otherwise have made.

103. Malenko wishes to pursue a career as a pharmacist but is concerned that Handrahan's repeated, false claims that he has poisoned M.M. with methamphetamines could negatively impact that goal of his as well.

104. Malenko testified that he is seriously considering changing his and M.M.'s last names in order to avoid the stigma now associated with those names as a result of Handrahan's internet postings.

105. As a direct result of Handrahan's false representations, Malenko has been deprived of the love and companionship of his child for long periods of time.

106. As a direct result of Handrahan's false representations, M.M. has been deprived of the love and companionship of her father for long periods of time.

107. As a direct result of Handrahan's actions and false representations, M.M. has suffered physical and emotional harm.

108. In March 2012, Maine DDHS concluded that Handrahan's actions on January 27, 2012 inflicted "high severity emotional abuse" on M.M. See Pl. Exs. 8a & 18.

## II.     CONCLUSIONS OF LAW

**Negligence and Negligent Infliction of Emotional Distress (Count VIII)**

1. The Court finds that Defendant at various times breached duties she had to Plaintiff and M.M. and that this breach caused harm to both Plaintiff and M.M.

2. As a result, the Court finds that a preponderance of the undisputed evidence supports Plaintiff's claim for negligent infliction of emotional distress.

**Intentional Infliction of Emotional Distress (Count I)**

3. Likewise, the Court finds that Defendant intentionally and recklessly inflicted severe emotional distress on Plaintiff and M.M.  At various times, her conduct was so extreme and outrageous as to exceed all possible bounds of decency.

4. These actions caused Plaintiff and M.M. emotional distress that was so severe that no reasonable person could be expected to endure it.

5. As a result, the Court finds that a preponderance of the undisputed evidence supports Plaintiff's claim for intentional infliction of emotional distress.

**Defamation Per Se (Count IV)**

6. Defendant has made false and defamatory statements of fact regarding Plaintiff. These defamatory statements were made without privilege to multiple third parties resulting in harm to Plaintiff. These defamatory statements alleged a publishable criminal offense, and, as a result, have related to and negatively impacted Plaintiff's professional career.

7. Therefore, the Court finds that a preponderance of the undisputed evidence establishes Plaintiff's claim for defamation per se.

**The Remaining Claims**

8. On the record presented, the Court cannot find that Plaintiff's other claims are established as a matter of law.

9. Additionally, the Court notes that many of these remaining claims necessarily overlap with ongoing family court proceedings. Given this overlap, the Court recognizes that the spirit of federal-state comity requires this Court abstain from rulings that might inadvertently impact ongoing state custody proceedings.

10. Plaintiff has provided no precedent to support his novel argument that the medical exam of a child conducted by licensed personnel pursuant to the consent of a parent can amount to an assault on that child. Even if the preponderance of the evidence viewed in hindsight establishes that the medical exam proceeded based on a false accusation, the preponderance of the evidence does not establish that the false nature of the accusations was known to medical personnel at the time any exam was undertaken. Therefore, the Court declines to find Count II established on the undisputed evidence.

11. Plaintiff has provided no precedent to support his argument that the violation of the terms of a visitation order involving a young child amounts to a claim for false imprisonment against

the parent who keeps the child for an extended and unauthorized visit. The Court declines to simply assume that Maine law would recognize a claim for false imprisonment on the unique albeit undisputed facts presented here.

12. To the extent that Defendant's undisputedly egregious behavior can be found to have interfered with any of Malenko's constitutional rights, the Court declines to find as a matter of law that said interference involved intentional physical force or violence against Plaintiff or involved the damage, destruction or trespass on Plaintiff's property. As a result, the Plaintiff has not proven a claim under the Maine Civil Rights Act, 5 M.R.S.A. § 4682 (Count V). See Andrews v. Dep't of Environmental Protection, 716 A.2d 212, 220 (Me. 1998) (holding that the Maine Civil Rights Act limits remedies to constitutional violations involving "physical force or violence, damage or destruction of property, trespass on property, or threats thereof.").[3]

13. The preponderance of the evidence does not establish a claim for wrongful use of civil proceedings. To the extent Plaintiff seeks to establish such a claim based on proceedings initiated against his lawyer, the Court questions whether Plaintiff has standing to assert such claims. Additionally, to the extent that the malicious civil prosecution claim asks this federal court to review various state proceedings and find them to be lacking in probable cause, the Court declines to do so as a matter of federal-state comity.

14. The Court declines to find Count VII established on the undisputed factual record now before the Court. Maine has recognized that parents, as "natural guardians" owe children "a fiduciary duty in regard to [the child's] property," Murphy v. Murphy, 694 A.2d 932, 936

---

[3] In his Proposed Default Judgment (ECF No. 68), Plaintiff appears to suggest that Handrahan's actions amounted to "physical force or violence or threats of physical force and/or violence" against M.M. The Court does not believe that the undisputed record shows that Handrahan "physically assaulted" or committed acts of violence or threatened violence against M.M. The Court received no direct evidence regarding the events of January 27, 2012. Even assuming such physical force or violence against M.M. was factually established, the Court cannot see how such acts make out a claim under the Maine Civil Rights Act as to Malenko personally.

(Me. 1997), it is not clear that Maine recognizes a breach of fiduciary duty claim based on a failure to protect and nurture. Plaintiff has provided no precedent to support the novel argument that under Maine law one parent's failure to protect and nurture a young child could serve as a basis for a breach of fiduciary duty claim.

**Damages**

15. As recently explained by the Law Court, there is a "high standard" for punitive damages:

> A punitive damage award must be based on tortious conduct and may be awarded only if the tortfeasor acted with malice. Punitive damages are available if the plaintiff can establish by clear and convincing evidence that the defendant's conduct was motivated by actual ill will or was so outrageous that malice is implied. For factual findings that must be proven under the clear and convincing standard, the issue is whether the factfinder could reasonably have been persuaded that the required factual finding was proved to be *highly probable*.

Laux v. Harrington, 38 A.3d 318, 328 (Me. 2012) (quoting Waxler v. Waxler, 699 A.2d 1161, 1165 (Me. 1997) (additional citations & quotation marks omitted). On the record before this Court as factfinder, there is not clear and convincing evidence that Handrahan's defamation and infliction of emotional distress was motivated by ill will or so outrageous that malice should be implied. Rather, it is just as likely that Handrahan's actions were motivated by genuinely held (albeit clearly mistaken) beliefs that she needs to "save" her child. While there is some evidence of outrageous conduct and malice toward Malenko, much of the evidence presented suggests that Handrahan's mistaken beliefs are the result of mental illness, rather than malice. Therefore, the Court does not award punitive damages.

16. With respect to compensatory damages, the Court awards Plaintiff individually $450,000 on Counts I, IV and VIII. The Court awards additional sum of $300,000 to Plaintiff on behalf

of M.M., this amount reflecting the compensatory damages owed to M.M. on Counts I & VIII.[4]

### III. CONCLUSION

As explained herein, the Court now ORDERS that Judgment be entered in favor of Plaintiff Igor Malenko, individually and on behalf of his minor child, on Counts I, IV and VIII of Plaintiff's Complaint. Based on the preponderance of the evidence presented to this Court, the Court hereby awards Plaintiff Igor Malenko compensatory damages in the amount of $450,000 on his individual claims and an additional $300,000 of compensatory damages to M.M on the claims brought on her behalf. On all other claims, judgment shall enter in favor of Defendant despite her default.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 24th day of October, 2012.

---

[4] The Court notes that even if it had found any of the other claims (Counts II, III, V, VI & VII) to be legally established on the record presented, such a finding would not provide a basis for the Court to award any additional compensatory damages.